EDWARD McMECHEN *vs.* THOMAS MARMAN.—*June*, 1836.

The purchaser of land sold under a *fieri facias*, applied to the county court for a writ of *habere facias possessionem*, under the act of 1825, ch. 103, against one in possession, under title subsequent to the rendition of the judgment on which the *fi. fa.* issued. It appeared that the judgment debtor had only an equitable interest in the land levied on, holding a bond of conveyance from the owner of the fee, and which bond he had assigned to the tenant in possession before the *fi. fa.* issued. Upon due proof of demand and failure to surrender possession to the purchaser, it was *Held,* that he was entitled to a writ of *habere facias possessionem.*

The act of 1825, ch. 103, is remedial in its character, and should be liberally construed to carry into full effect the designs of the legislature. The evil

intended to be remedied by it was, that debtors and those claiming under them after a sale of their lands by the sheriff, held on to their possession until ousted by the tedious process of· ordinary judicial proceedings, both legal and equitable estates in land are within its operation.

Equitable estates are primarily liable to sale under a *fi. fa.* in the same manner that legal estates are.

The county court in this cause having refused to issue a *hab. fac. pos.* and this court having reversed their judgment, ordered a *procedendo*. That writ having been issued, the court here countermanded the *procedendo* at the next term, and awarded a writ of *hab. fac. pos.* to issue from this court.

APPEAL from *Frederick* county court.

This· was an application by the appellant, for a writ of *habere facias possessionem*, under the act of 1825, ch. 103.

In his petition which was filed on the 4th of November, 1834, he stated, that he became the purchaser of certain lots in the City of *Frederick*, on the 16th of May, 1834, at a sheriff's sale made to satisfy two judgments rendered against one *Solomon Rank*, at February and October terms, 1833. That since his purchase, he had demanded possession of the defendant, who held the same by title subsequent to the dates of the judgments, but refused to surrender the possession, and the appellant therefore prayed, that a rule might be laid on the appellee or party in possession, to show cause within the first four days of the next term, why the writ of *habere facias possessionem*, should not issue.

The writs of *fieri facias* were issued on the 8th of March, and 5th of April, 1834, returnable to the then ensuing, October term.

After proof that the possession had been demanded, and that the appellee had failed and refused to deliver it, the county court on the 4th of November, 1834, passed a rule, "that the said *Thomas Marman*, show cause within the first four days of February term, 1835, why a writ of *habere facias possessionem*, shall not issue to the sheriff of *Frederick* county, commanding the said sheriff to deliver possession of the premises aforesaid to the said *McMechen*, as the purchaser thereof, provided that a copy of the rule be served upon the said *Marman*, at least twenty days before the first day of February term, 1835.

Service of a copy of the rule being proved, the appellee at February term, 1835, exhibited the following causes against the issuing of the writ.

1. That before the issuing of the writs of *fi. fa.* under which the property was sold, the said *Rank* had assigned all his interest therein to the appellee, for a valuable consideration.

2. That *Rank,* at the date of the rendition of the judgments, upon which the writs were issued had no such title or interest in the property sold, as could be bound or reached by said judgments.

3. That at the time said judgments were rendered, and at the time the writs were issued and levied, the said *Rank* held in fee simple in *Fredericktown,* real property, fully sufficient to satisfy the judgments, without resorting to the property sold.

4. That the appellee did not at the time of the sale, and does not now hold the said property, so as to render it liable to be reached by the writ of *habere facias possessionem,* under the act of 1825, ch. 103.

5. That the sale under the *fi. fa.* was fraudulent and void, the sheriff or auctioneer having refused a *bona fide* and responsible bid, higher than that at which the property was sold to the appellant.

6. That the proceedings, sale and return by the sheriff under the writs were defective, irregular and void.

In support of these reasons, the appellee filed a bond of conveyance from *Levi Davis* to the said *Rank,* for the lots in question, dated on the 27th of December, 1830, with an assignment thereof by the obligee, to the appellee in this case dated March 3d, 1834, and purporting to have been made for a valuable consideration paid to the assignor by the said *Marman* and his daughter.

The county court on the 3d of March, 1835, discharged the rule, and thereupon the appellant appealed to this court.

The cause was argued before STEPHEN, DORSEY, CHAMBERS, and SPENCE, Judges.

WORTHINGTON, for the appellant.

In this case three questions arise :

1. Is a judgment a lien at law, on an equitable interest?

2. Does the act of 1825, ch. 103, authorize the county courts to order a *habere facias possessionem*, in favour of the purchaser of an equitable interest, under a *fieri facias*, issued by said courts.

3. Whether a judgment is or is not a lien at law, on an equitable interest, can a person in possession holding under the debtor by title subsequent to the judgment, set up such title in bar of the writ of *habere facias*, under the act of 1825, ch. 103, if that act embrace the sale of an equitable interest ? In discussing the first question, it may be necessary for the purpose of understanding and elucidating the acts of our legislature and the practice of our courts, to trace the lien of judgments *ab ovo*. At common law no such lien existed. The only process by which a judgment creditor could reap the fruits of his judgment, was by a *fieri facias* against the goods, chattels and leasehold lands of the debtor, and a *levari facias* against the rents and growing profits of his lands, until the debt was satisfied. The military policy of the feudal system forbade the tenant from severing the tie between himself and his lord, by the alienation of the fief, and as a consequence from encumbering it with his debts, whereby it might be in the power of the creditor to deprive him of the possession, and transfer it to another tenant, who might not be as acceptable to the lord as the debtor himself. But when restraints on alienation began to yield to more enlightened considerations, the creditor was less advantageously situated than when these restraints were in full life. The creditor could then levy the rents and growing profits of the land until his debt was extinguished, but after alienations were allowed the debtor might deprive him of this resource by transferring the land to another. For the judgment did not at common law bind the land, and a *levari facias* bound only the growing profits. The creditor could not therefore, pursue the lands in the possession of the alienee. His

remedy against the freehold lands of the debtor was thus defeated. Thus stood the condition of the creditor at common law. The judgment was no lien on the land itself, nor on goods, chattels, or leasehold lands, and a *fi. fa.* bound goods, chattels and leasehold estates, only from its *teste.* To afford a more effectual remedy against the lands of the debtor, the statute of *Edward the first,* called the statute of *Westminster the second,* was passed, which gave to the judgment creditor his election to sue out either a writ of *fi. fa.* or else that the sheriff should deliver to him all the chattels of the debtor, (save his oxen and beasts of the plough) and also one-half of his land, until the debt was levied upon a reasonable price or extent. The goods and chattels under this statute, were delivered to the creditor at a reasonable price or appraisement in satisfaction of his debt, and one-half the land delivered *quosque debitum satisfactum fuerit.* There are no express words in this statute, by which a judgment is made a lien on land, nor does it specify what species of land shall be extended, but judicial writers and the courts here confined its operation to freehold and leasehold lands, and the *lien* of the judgment to a moiety of the *freehold* lands, only which the debtor held *tempore redditionis judicii,* or which he might subsequently acquire. It is said to be a lien on freehold lands, because it enabled the creditor to obtain possession of one half of the debtor's lands, or *because the lands are liable to the execution of the creditor whenever he pleases to sue out writs for that purpose.* 1 *Cov. Pow.* 274, note (*b.*) The statute directs the sheriff to deliver to the creditor one-half of the debtor's lands, but does not designate the lands he held at any particular time, whether such as he held at the date of the judgment, or at the time of suing out the *elegit,* but the courts have fixed the *punctum temporis* at which the lien attaches to such lands as he held at the date of the judgment, and to such as he subsequently acquired. If the statute were to be construed literally, the directions to the sheriff to deliver a moiety of the debtor's lands, would seem to embrace such lands only as the debtor had at the time the

*elegit* comes into the sheriff's hands. For if he had aliened them they were no longer his property, and the sheriff could not deliver *as the lands of the debtor* such as he had aliened prior to the *elegit*. Yet the courts here decided that the sheriff should deliver a moïety of the lands, the debtor held at, and subsequent to the date of the judgment, whether they remain in his possession or not; and this construction has been given *because a moiety of the lands is liable to the execution of the judgment creditor*. The construction has been different as to the chattels and leaseholds, because they were liable at common law to a *fi. fa.* and by that law they were bound only from the *teste* of the *fi. fa.* Leaseholds are considered goods, and the word " goods" in the statute of frauds, has been decided as embracing them, when it makes a *fi. fa.* binding on goods from the delivery of the writ to the sheriff. It has then been settled, that under the statute of *Westm.* 2, a judgment binds only freehold lands. The reason given, that freehold lands are bound, *because they are liable to the execution of the judgment creditor;* equally applies to leaseholds, as they are liable to the elegit of the creditor under the same statute; yet a judgment does not bind leaseholds, because they were liable at common law to be sold under a *fi. fa.* like goods and chattels, and judgments were therefore never considered as binding them under that law. The creditor would in almost all cases prefer a *fi. fa.* to an *elegit,* in the case of leaseholds, as by an *elegit* he could extend but one half of the leaseholds, when by a *fi. fa.* he could sell the whole. It has also been decided, that copy-holds are not embraced by the statute of *Westm.* 2, although it speaks of land generally, and a copy-hold even at this day is governed by the feudal principle, and cannot be affected by a sale or seizure to satisfy a judgment. Under the statute of *Westm.* 2, no other than the legal estate in a freehold or leasehold can be extended; and under a *fi. fa.* nothing but the legal interest in goods, and chattels, and leaseholds, can be sold under the *English* law. The judgment therefore, was a lien only on the legal estate in freehold lands, and a *fi. fa.*

was a lien only on the legal interest in goods, and chattels, and leaseholds, because in the one case none but the legal estate could be extended, and in the other none but the legal estate in goods, chattels, and leaseholds, could be sold under a *fi. fa.* No equitable interest could be extended under the statute of *Westm.* 2, and of course a judgment could not bind it; and no equitable interest in goods, chattels, and leaseholds, could be sold under a *fi. fa.* and therefore, the *fi. fa.* did not bind it. A judgment did not bind an equitable interest at law, *because the judgment could not reach it at law;* it could only reach it in equity. It therefore, bound in equity without notice, if docketed, but if not docketed, but only entered on the paper roll and signed, it did not bind without notice. The doctrine of legal and equitable lien depends mainly upon this distinction. 1 *Cov. Pow.* 275, *note. Ib.* 276, *note. Ib.* 277, 278, 279, *note.* We come now to the statute of 29 *Charles* 2, ch. 3, sec. 10. That statute made it lawful for every officer to whom a precept was directed upon any judgment, " to do, make and deliver execution unto the plaintiff of all such lands, tenements, tythes, rents and hereditaments, as any other person should be in any manner of wise, seized or possessed in trust for him against whom execution is so sued, like as such officer might or ought to have done, if the said party against whom execution should be, had been seized of such lands or of such estate as they be seized of in trust for him, *at the time of the said execution sued.*" After uses had been united to the possession by the statute of *Henry* 8, trusts succeeded them, but they were not liable to be extended under an *elegit,* or sold under a *fi. fa.* They were generally, fraudulent and covenous, in which the *cestui que trust* had the whole real beneficial interest, and the trustee the naked formal title only. The statute of frauds enabled the judgment creditor to extend the trust lands, in the seizin of the trustee in the same manner as if the judgment debtor had been seized thereof, and they could therefore, be affected only by extending a moiety until the debt was satisfied. The judgment lien is negatived

by the directing words to do and make execution only of such lands of, as the trustee was seized of, *at the time of the said execution sued*, and the same were to be held and enjoyed, " freed and discharged of all incumbrances of the trustee." 1 *John. Ch. Rep.* 52. The lien is thus expressly confined to the suing out, or the delivery of the *elegit* to the sheriff. If this statute had not by express words, restricted the lien to the time of the execution, the general words, " to do, make and deliver, would, I presume, have been entitled to the same construction as the statute of *Westm.* 2, and the judgment would here bind the *equitable* in the same manner as the *legal* estate is bound by that statute. Under the statute of *Charles* 2, it has been decided, that the entire equitable interest at the time of the execution, must be in the *cestui que trust*, and the naked legal title only outstanding in the trustee ; and on this ground it has been held, that an equity of redemption is not liable to an execution under that statute, because only a partial equitable interest is in the mortgagor, the mortgage debt being a lien thereon. If the trustee has only the naked legal title it is covenous *per se*, but if he has any beneficial interest a court of law will not interfere, but leave the creditor to his remedy in equity, and will not undertake to decide whether it is covenous or not. But under this statute, even when the entire equitable interest is in the *cestui que trust*, the trust estate cannot be sold under a *fi. fa.* An equitable interest in no case, either under this statute, or at common law, or under any other *English* statute, is liable to be sold under a *fi. fa.* and it is only liable to an *elegit*, in the single case in which the entire equitable interest is in the *cestui que trust*, and the naked legal title only in the trustee, at the time of the execution. The only instance in which lands in *England* can be reached by *fi. fa.* is against the legal estate of leaseholds. Neither the equitable interest in a leasehold, nor the legal or equitable interest in freehold, or the equitable interest in goods and chattels can be reached by a *fi. fa.* All equitable interests, including an equity of redemption, can only be reached in equity, except

the single instance provided for by the statute of *Charles* 2, where the entire equitable interest is in the debtor and the naked legal title in his trustee, at the time of the execution sued out. The only instances in which lands in *England*, can be reached at law by a judgment creditor are, first, by a *fi. fa.* or *elegit* against the *legal* estate in *leasehold* lands; second, by an *elegit* against the *legal* estate in *freeholds*, and third, by an *elegit* against *trust* lands, under the statute of *Charles* 2. So stood the *English* law prior to the statute of *George* 2. The statutes of *Westm.* 2, and *Charles* 2, were intraterritorial; that of *George* 2, was extraterritorial, and it was a radical innovation on existing remedies in the plantations and colonies to which its operation was confined. Not only was the totality of the debtor's lands subjected to the payment of his debts, but they were made liable in the same manner as goods and chattels. This statute was intended for the benefit of *British* creditors only, but our *State* courts have applied it, also, to domestic creditors, and the practice since that statute has been to sell lands under a *fi. fa.* in the same manner as goods and chattels. There is nothing in this statute, which by express words, makes a judgment binding on a moiety or the whole of the debtor's lands, but it did in effect make them binding on the whole, by subjecting them to the execution of the judgment creditor. If judgments are liens in this *State*, by virtue of the *statute Westm.* 2, they bind only a moiety. If it be not by virtue of the statute of *George* 2, that a judgment binds *all* the lands of the debtor, by what law do they bind the entirety? They do not at common law, not even a moiety. By the statute of *Westm.* 2, they bind only a moiety. They must bind the *whole*, then, under the statute of *George* 2, because by that statute the whole of the debtor's lands is *subject to the execution of the judgment creditor whenever he pleases to sue it out.* At the time of the passage of that statute, the statute of *Westm.* 2, was in force in this *State*, and the goods and chattels of the debtor were appraised and delivered to the creditor in satisfaction of his debt, and a moiety of his lands

extended. But soon after the enactment of the statute of *George* 2, the remedy by *elegit* was abandoned, and judgment creditors since have always had recourse to a *fi. fa.* as well against lands as against goods and chattels. *Kilty's Rep. Stat.* 249. It was at one time decided by the late general court, that a judgment did not bind lands under the statute of *George* 2, but, that like goods and chattels, they were bound only from the delivery of the *fi. fa.* to the sheriff. 1 *Har. and John.* 473, *note.* The same judges, whether before or after this decision does not appear decided, that a senior judgment creditor might reach lands, in the hands of a purchaser under a junior judgment, and re-sell it in satisfaction of the first judgment. 3 *Har. and McHenry*, 449, and the practice has conformed to the decision last mentioned. It is now generally considered, that a judgment when rendered by a court of record, binds the whole of the debtor's lands against all subsequent incumbrances, and that a judgment creditor may reach them thus bound, in the hands of a subsequent alienee, whether conveyed by the debtor himself, or sold under execution to satisfy a junior judgment. I will here concede for the sake of the argument, that prior to the act of 1810, ch. 160, which I shall presently notice, none but the legal estate in lands could be sold under a *fi. fa.* whether freehold or leasehold, except under a judgment of condemnation in attachment, in which case it has been decided, that an equitable interest might be attached, condemned and sold under a *fi. fa.* 5 *Har. and John.* 316. I conclude, therefore, on a view of the whole subject, that by virtue of the statute of *George* 2, a judgment binds the legal estate in the *whole* of the freehold lands of the debtor, because the *whole* is by that statute *made liable to the execution of the judgment creditor.* The statute did not embrace leaseholds, because at common law they were subject to a *fi. fa.*

We come now to an equitable interest in lands, as affected by the laws of this *State.* In the case of *Campbell and Morris*, the late general court was of opinion, that an equitable interest was not liable to attachment, *because it was not tangible*,

*and could not be seized or taken into custody.* 3 *Har. and McHenry,* 557. The opinion was delivered by judge *Chase. Lord Ellenborough,* entertained a similar opinion in the case of a *fi. fa.* These two learned judges indulged so much in abstractions, that one thought it *impossible* that an *attachment* could reach an equitable interest, and the other that a *fi. fa.* could not reach it. 8 *East. Rep.* 467. They seemed to think it a shadow, some " unreal mockery," some " aeriform being," some " air drawn dagger," that eludes the sight as well as the touch, so that it could not be taken into custody or seized. But what *Lord Ellenborough—clarum et venerabile nomen—*thought impossible, our legislature achieved with a few bold strokes of the pen. By the act of 1810, ch. 160, " it shall be lawful for any sheriff or other officer to whom any writ of *fi. fa.* shall be directed to *take, seize* and *expose* to sale *any equitable interest or interests,* which the defendant named in such writs may have or hold in any lands, tenements or hereditaments." This wise act of our legislature has put to flight these metaphysical subtleties, mixed up with the dialectics and categories of Aristotle, and the whole cognate brood will ere long, I hope, be driven to their ancient fastnesses, by the *genius* of reason and common sense operating through the philosophy of legislation. It is no longer impossible to *take, seize* and *expose* to sale an equitable interest. It *is* made an object of two of the senses at least, touch and sight, for without the " *touch*" it could not be taken, and without the " *sight*" it could not be exposed to sale. The legislature, then, has put an end to this argument of impossibility, and an equitable interest can be *taken, seized* and *sold* under a *fi. fa.* The construction, then, put on the statute of *Westm.* 2, must by parity of reason, be put on the act of 1810, ch. 160. If a judgment is a lien on the *legal* estate, under the statute of *Westm.* 2, *because the legal estate is subject to the execution of the judgment creditor,* it is a lien on the *equitable interest,* under the act of 1810, *because the equitable interest is subject to the execution of the judgment creditor.* Next comes the act of 1825, ch. 103.

By that act the court shall order possession, if the debtor refuses to deliver possession to the purchaser, or any person claiming under the debtor, by title *subsequent* to the judgment. Why did the legislature confine the claim of title to a point of time subsequent to the judgment, if the judgment did not bind? The sense of that body cannot be doubted. The judgment was considered a lien, and therefore, if the party in possession claim the same, by title subsequent to the judgment, he claims against the lien, and therefore, his claim shall not avail him. This is as conclusive as a declaratory act on the subject, and it ought *so to be construed.* The language of the act is positive and unequivocal. It can bear but one construction, that no title acquired *subsequent* to the judgment shall be set up in opposition to the writ of *habere facias,* authorized by that act. This act applies to the sales of all interests in lands, whether legal or equitable, and the purchaser of an equitable interest is as much entitled to possession under it, as the purchaser of a legal interest. The act makes no distinction and intended to make none. It was passed subsequent to the act of 1810, and no doubt it intended to embrace sales under that act as well as sales of the legal interest. The act of 1825 says, whenever any lands or *tenements* shall be sold, the word "tenements" will embrace an equitable *interest.* Tenement means any thing that may be *holden,* provided it be of a permanent nature. An equitable interest may be holden. It is so declared by the act of 1810. The sheriff shall take, seize and expose to sale any equitable interest or interests which the debtor may have or "hold." 2 *Blk. Com.* 16. We now come to the act of 1831, ch. 290. This act puts beyond doubt, the sense of the legislature on this subject. By the 6th section of that act, it is enacted "that no judgment rendered by a justice of the peace, unless and until the same shall, on appeal, be affirmed by a county court, be deemed and taken to be a lien on any lands, tenements, or real estate or estates, or any interest therein, legal or *equitable.*" It shall not be a lien *unless or until affirmed,* will

make it a lien, by necessary implication *when* affirmed. It shall not be a lien unless affirmed, but when affirmed, it shall be a lien and not before. This negative is as pregnant with an affirmation, as the one mentioned in *Litt. Rep.* 65; which carries an affirmation in its belly. If a judgment of a justice of the peace binds an equitable interest in lands, when affirmed by a county court, will it be contended that a judgment of the same court, in a case originating there, does not also bind? Does our legislature present such a hideous anomaly? Such a fatuitous absurdity? This would be maintaining that the judgment of a county court, in its appellate capacity, stands upon higher grounds than judgments under its original jurisdiction, and that judgments of the same court are not alike binding. Why does the judgment of a justice of the peace bind an equitable interest when affirmed? Because it is the judgment of the county court, and because all judgments of that court are alike binding on such interests, and this is taken for granted by the act last mentioned. I will now proceed to examine another provision of the act of 1831, ch. 290, in support of the second position for which I contend. The 5th section of this act provides " that the act of 1825, ch. 103, and the supplements thereto, shall be deemed and taken to extend and apply, and are hereby extended and applied to sales by constables or sheriffs as aforesaid, ratified and confirmed as aforesaid to every effect, intent and purpose, as if such sales had been specifically mentioned in said act and the supplements aforesaid ; and the writ of *habere facias possessionem*, in said acts and supplements provided for, may be issued by the county court to which the proceedings as to said sales shall be returned as aforesaid, and be by said court acted on and with, as if the execution under which such sales shall have been made, *had issued from said county court, on a judgment therein recovered.*" It is further provided by the second section of the same act, " that it shall and may be lawful for any constable or sheriff by virtue of any *fi. fa.* or on any judgment rendered by a justice of the peace, to seize

and sell the rights, title, claim, interest and estate, at law and in equity of the party or parties against whose property said execution shall have issued, to, and in, and out of any lands or tenements and real estate," &c. Taking the acts of 1810, 1825 and 1831 together, and we must conclude, that the act of 1825, ch. 103, does embrace the sale as well of an equitable as of a legal interest in lands, and that the purchaser of an equitable interest under a *fi. fa.* issued by a county court, is equally entitled to a writ of *habere facias* under that act, as the purchaser of an equitable interest under a *fi. fa.* issued by a justice of the peace. The act of 1810, as well as the act of 1831, embraces all interests in lands, whether legal or equitable, and the purchaser under both acts ought to be placed on the same footing. If the act of 1825, does not embrace the sale of an equitable interest under the act of 1810, our laws present an extraordinary spectacle. They enable a purchaser of an *equitable interest* under an execution issued by a *justice of the peace*, to obtain possession of lands purchased by him, in a summary mode under the act of 1825, but the purchaser of an equitable interest, under an execution issued by a *county court*, cannot obtain possession under that act.

In support of the third position I contend, that if the act of 1825, embrace the sale of an equitable interest, it is immaterial whether the judgment be a lien or not. The party in this case claims by title subsequent to the judgment, and such defence is expressly shut out by that act. The courts are expressly authorized to give summary possession to the purchaser, against the debtor himself, and any person holding under him, *by title subsequent to the judgment*. If then, the court should decide that the act of 1825, ch. 103, embraces the sale of an equitable interest, the third position is necessarily established. From the foregoing inquiry it results, that according to the *English* law, a judgment binds at law, the legal estate in freehold land, because it may be enforced at law, against the legal estate ; that, according to the same law, it does not bind at law an equitable interest,

because it cannot be enforced at law, against the equitable interest, except under the statute of *Char.* 2, when the legal estate is in the seizin of the trustee, at the time of the execution sued out; that the reason given why, by the *English* law, a judgment does not bind at law, an equitable interest, because it cannot be enforced at law against the equitable interest, goes to show that it does bind an equitable interest by the *Maryland* law, because it can be enforced at law against an equitable interest; that as a general proposition, a judgment binds at law an estate in lands, whenever it can be enforced at law, and that it binds in equity, whenever it can be enforced in equity; that if it binds the *legal* estate, under the statute of *West.* 2, *because it is liable to the execution of the judgment creditor,* it must for the same reason bind the equitable estate under the act of 1810, ch. 160, because that act makes it *liable to the execution of the judgment creditor;* that the act of 1825, ch. 103, embraces the sales of all interests in lands, whether legal or equitable, as it makes no distinction between such interests. That if it do embrace the sale of an equitable interest, then, it is immaterial whether the judgments are a lien or not, as the person holding the possession claims under the judgment debtor, by title subsequent to the judgments. *Cited,* 1 *Cov. Pow.* 274, note, 277, 278, 279, *note.* *Ib.* 281, 282, *note.* *Ib.* 308, note. 2 *Cov. Pow.* 601, *text,* 603, *text.* *Ib.* 605, *note,* 606, *note,* 612, *note.* *Ib.* 608, *text,* 598, *text.* *Stat.* 13, *Ed.* 1, ch. 18. *West.* 2. 29 *Char.* 2, *ch.* 3, *sec.* 10. 5 *Geo.* 2, *ch.* 7, *Acts of Assembly.* 1810, *ch.* 160. 1825, *ch.* 103. 13, ch. 290. 1 *Har. and McHenry,* 473, *note.* 3 *Har. and McHenry,* 449, 557. 5 *Har. and John.* 316. 5 *Gill and John.* 1.

Wm. Schley, for the appellee.

The question is, whether a judgment from its date, is binding upon an equitable interest in lands held by the judgment debtor; because, although the defendant himself might not be allowed to urge the infirmity of his title, in opposition to

the application of the purchaser to be put in possession, a third person, such as the appellee, cannot be so restricted.

In *England* unquestionably, judgments are not liens upon equitable interests. 2 *Powl.* 598, 602, 603. And the same doctrine has been repeatedly announced by the courts in this country. *Bogart vs. Perry,* 1 *John. Ch. R.* 56. *Bogart vs. Perry,* 17 *John. Rep.* 353. *Hendricks vs. Robinson,* 2 *John. Ch. R.* 312. *Hopkins vs. Stump,* 2 *Har. and John.* 304. It appears from the bond of conveyance from *Davis* to *Rank,* the defendant in the judgment, that the whole purchase money had not been paid, and consequently the obligor in that bond, was not seized wholly for the use of the obligee. To the extent of the sum. due on the bond, he was seized to his own use. The purchaser acquired the title of *Rank,* and no more. Unless therefore, the judgment operated as a lien upon the property from its date, the possession of *Rank's* assignee cannot be disturbed.

Under the act of 1810, ch. 160, the purchaser of an equitable estate, besides paying the purchase money, is required to get an assignment, or conveyance from the sheriff. The act of 1825, ch. 103, only speaks of lands and tenements, which do not technically mean equitable estates. By them are understood freeholds at common law; that is, their legal and technical meaning, and when used by the legislature, they are to be construed in their technical sense. 1 *Cov. Powel,* 604, *note (z.)*

The act of 1816, ch. 154, which employs the words, "lands," &c. did not authorize the sale of equitable estates belonging to infants, for which a remedy was provided by the act of 1818, ch. 193. sec. 7.

Parties being by the act of 1825, deprived of the privilege of the trial by jury, its provisions should not be extended by construction. It should be confined to cases of undoubted liens, the more especially, as it applies not only to the defendant in the judgment, but to persons who acquire from the defendant subsequently to its date.

Dorsey, Judge, delivered the opinion of the court.

In shewing cause against the issuing of the *hab. fac. poss.* six grounds have been assigned by the appellee; the 5th and 6th of which appear to have been abandoned in the argument, and we are not aware of any thing in the record, upon which they could have been sustained. The third ground we deem wholly untenable. Equitable estates being primarily liable to sale under a *fieri facias*, in the same manner that legal estates are, and there being nothing in the transaction, from which the court could impute fraudulent, or improper motives to any person concerned in the levy and sale that has been made, nor is there a shadow of proof of the fact alleged, " that at the time of the rendition of said judgments, and at the time of issuing said *fi. fa.* and at the time of the levying of said *fi. fa.* the said *Solomon Rank* held, in fee simple in *Fredericktown*, real property, fully and amply sufficient to satisfy said judgments and *fi, fa.* without coming upon the property sold." The insufficiency of the first and second causes assigned, has been settled by this court, in the case of *Miller vs. Allison and others*, decided at the present term; in which it was held, that a judgment was a legal lien upon an equitable estate in lands, and bound them from its date, and not merely from the date of the *fi. fa.*

The fourth ground alone, remains to be considered, viz; whether the purchaser of such an estate, at a sheriff's sale, can obtain possession under the provisions of the act of assembly of 1825, ch. 103; the *first* section of which, provides, " that whenever any lands or tenements shall be sold by any sheriff, coroner, or elizor, by virtue of any process of execution from the Court of Appeals, court of Chancery or any county court; and the debtor or debtors named in said process, or any other person or persons, holding under such debtor or debtors by title subsequent to the date of the judgment or decree, shall be in the actual possession of the lands or tenements so sold, and shall fail or refuse to deliver possession of the same to the purchaser or purchasers thereof, it shall and may be lawful for the court to which such process

shall be returnable, on the application of the purchaser or purchasers of the said land and tenements, his, her or their agent or attorney ; and on no good cause having been shown to the contrary, by the said debtor or debtors, his, her or their agent or attorney, or other person concerned, within the first four days of the term, next succeeding that to which the said process was returnable, to issue a writ, in the nature of a writ of *habere facias possessionem*, reciting therein, the proceedings which may have been had on said process, thereby commanding the said sheriff, coroner or elizor, as the case may be, to deliver possession of the said lands or tenements, to the purchaser or purchasers thereof."

This act of assembly is remedial in its character, and therefore should be liberally construed, in order to carry into full effect the designs of the legislature. The evil intended to be remedied, was that debtors and those claiming under them, after a sale of their lands by the sheriff, held on to their possession, until ousted by the tedious process of ordinary judicial proceedings ; thus against every principle of law and equity, without the ability of making ultimate indemnity for their wrong doings, depriving purchasers for years of all enjoyment of the lands they had honestly paid for ; during which interval, it is more than probable, that those lands were greatly diminished in value, by a most severe and exhausting cultivation. The necessary consequence of such a state of things must be the sacrifice of the interests of creditors, by depreciating the value of that fund, from which the payment of their debts is to be sought.

The mischief complained of, operated with like severity on purchasers both of legal and equitable estates. The legislature therefore could have had no adequate motive for discriminating between them ; for denying to one what was freely granted to the other. The mischief to be removed was the same in both cases ; the remedy provided equally applicable to each class of purchasers ; not a word to be found in the law intimating any distinction between them. Upon what recognized principle of construction then, can we

under the act of assembly withhold from the one, what is conceded the other.

Believing that the county court erred, in refusing the writ applied for in this case, *we reverse their judgment. Let a writ of habere facias possessionem issue from this court.*

**JUDGMENT REVERSED.**